UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

ANTHONY WAYNE SCHELIN,

            Plaintiff,

     v.

CAROLYN W. COLVIN,
Acting Commissioner of Social
Security,

           Defendant.

No. CV-14-79-FVS

ORDER GRANTING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

**THIS MATTER** comes before the Court based upon cross motions for summary judgment.  Plaintiff Anthony W. Schelin is represented by Dana C. Madsen.  Defendant Carolyn W. Colvin is represented by Franco L. Becia.

**JURISDICTION**

On July 11, 2012, Anthony W. Schelin applied for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  The Social Security Administration ("SSA") denied both his initial application and his request for reconsideration.  Mr. Schelin asked for a hearing.  An Administrative Law Judge ("ALJ") held one on March 21, 2013.  Mr. Schelin represented himself.  On April 15, 2013, the ALJ issued an unfavorable decision.  Mr. Schelin asked the Appeals Council to review the ALJ's decision, but the Appeals Council declined to do so.

Order - 1

At that point, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 416.1481.  Mr. Schelin commenced this action.  42 U.S.C. § 405(g).  Both he and the Commissioner move for summary judgment.

**BACKGROUND**

Anthony W. Schelin was born on February 13, 1973.  (Tr. 39.[1]) His father played no part in his life.  (Tr. 267.)  He lived with his mother, who was an alcoholic.  (Tr. 48, 267.)  She abused him emotionally, physically, and sexually; expelling him from their home when he was about 13 years old.  *Id.*  From then on, he was forced to fend for himself.  He began committing serious crimes, including the sexual abuse of a young child.  (Tr. 49.)  His life was painful.  On more than one occasion, he attempted to commit suicide.  (Tr. 41, 49-50.)  Little changed when he reached adulthood.  He continued to commit serious crimes, which resulted in repeated periods of imprisonment.  (Tr. at 40, 49-51.)  Most recently, he was sentenced to prison for possession of a stolen vehicle.  (Tr. 40.)  While in prison, he again attempted to commit suicide.  (Tr. 41.)  As a consequence, he served most of his sentence in the prison's mental health unit.  (Tr. 41, 267.)  From time to time, he was evaluated by psychiatrists, who prescribed a variety of medications.  (Tr. 42.)

---

[1]The abbreviation "Tr" frequently stands for the word "transcript," as in the written record of a hearing.  In the Eastern District of Washington, the abbreviation "Tr" has a more expansive meaning.  It refers to the entire administrative record, not just to the transcript of the hearing that was conducted by the ALJ.

Order - 2

In Mr. Schelin's opinion, the medications did little to combat his depression and anxiety.  *Id.*  He was released from prison during the summer of 2011.  Between then and the summer of 2012, he was evaluated by mental health professionals on a number of occasions.  As explained above, Mr. Schelin applied for Title XVI SSI benefits on July 11, 2012.  He alleges he has been disabled since July 1, 2006.  An ALJ held a hearing on March 21, 2013, and the ALJ issued an unfavorable decision on March 28, 2013.

**ALJ'S DECISION**

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The SSA has established a five-step process for evaluating disability claims such as Mr. Schelin's.  20 C.F.R. § 416.920.  The ALJ followed the specified process in arriving at an unfavorable decision.

A. Step One

A person who is engaged in substantial gainful activity is not eligible for SSI benefits.  20 C.F.R. § 416.920(a)(4)(i).  Thus, at step one, Mr. Schelin had to show he had not engaged in "substantial gainful activity" since the date upon which he applied for SSI benefits.  *Id.*  "Substantial gainful activity means work that . . . (a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit."  20 C.F.R. § 416.910.  Mr. Schelin carried his burden.  (Tr. 25.)  As a

Order - 3

result, the ALJ proceeded to Step Two.

B. Step Two

At step two, the ALJ assessed the "medical severity" of Mr. Schelin's impairments.  Mr. Schelin had to show he has "a severe medically determinable physical or mental impairment that meets the duration requirement in § 416.909, or a combination of impairments that is severe and meets the duration requirement[.]"  20 C.F.R. § 416.920(a)(4)(ii).  An impairment is "severe" if it "significantly limits" the claimant's "physical or mental ability to do basic work activities."  20 C.F.R. § 416.920(c).  Absent a severe medically determinable impairment (or combination of impairments), the ALJ would have rejected Mr. Schelin's claim at step two.  As it turned out, the ALJ determined Mr. Schelin has three severe impairments, *viz.*, "personality disorder, depression and posttraumatic stress disorder."  (Tr. 25.)  Having determined Mr. Schelin is severely impaired, the ALJ proceeded to step three.

C. Step Three

At step three, the ALJ considered whether Mr. Schelin's impairments are so severe he is conclusively presumed to be disabled. *See Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir.1998).  Resolution of the issue turns upon whether Mr. Schelin has any impairment, or combination of impairments, that equals an impairment that is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 416.920(a)(iii), 416.925(a).  *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1194 (9th Cir.2004).  SSA regulations state in pertinent part:

Order - 4

The Listing of Impairments (the listings) is in appendix 1
of subpart P of part 404 of this chapter.  For adults, it
describes for each of the major body systems impairments
that . . . [the SSA considers] to be severe enough to
prevent an individual from doing any gainful activity,
regardless of his or her age, education, or work
experience.

20 C.F.R. § 416.925(a).  "When a claimant meets or equals a listing,
'he is presumed unable to work and is awarded benefits without a
determination whether he actually can perform his own prior work or
other work.'"  *Kennedy v. Colvin*, 738 F.3d 1172, 1176 (9th Cir.2013)
(quoting *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107
L.Ed.2d 967 (1990)).  The claimant bears the burden of proof at step
three.  *See, e.g., Molina v. Astrue*, 674 F.3d 1104, 1110 (9th
Cir.2012).  In this instance, the ALJ decided Mr. Schelin had not
demonstrated he has either an impairment, or a combination of
impairments, that equals an impairment that is listed in 20 C.F.R.
Part 404, Subpart P, Appendix 1.  Consequently, the ALJ concluded he
had failed to establish a conclusive presumption of disability.

D. Step Four

At step four, the ALJ evaluated whether Mr. Schelin can perform
his "past relevant work" given his "residual functional capacity."
20 C.F.R. § 416.920(a)(4)(iv).  The SSA defines "past relevant work"
as work that "was done within the last 15 years, lasted long enough
for you to learn to do it, and was substantial gainful activity."  20
C.F.R. § 416.965(a).  Mr. Schelin's residual functional capacity
("RFC") is the most he can do in a work setting despite his physical
and mental limitations.  20 C.F.R. § 416.945(a)(1).  In assessing Mr.

Order - 5

Schelin's RFC, the ALJ had to consider "all of the relevant medical and other evidence."  20 C.F.R. § 416.945(a)(3).  The ALJ found Mr. Schelin's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms[.]"  (Tr. 28.)  Given that finding, the ALJ proceeded to "evaluate the intensity and persistence of [Mr. Schelin's] symptoms so . . . [he could] determine how [Mr. Schelin's] symptoms limit [his] capacity for work[.]  20 C.F.R. § 416.929(c)(1).  This necessitated a careful review of the record.  Among other things, the ALJ considered both Mr. Schelin's statements and the opinions of John Arnold, Ph.D., an examining psychologist.  The ALJ determined Mr. Schelin's statements concerning his restrictions are "not entirely credible," and he assigned only "some weight" to Dr. Arnold's psychological assessments.  After reviewing the record, the ALJ decided Mr. Schelin does not suffer from any exertional limitations, but he does suffer from nonexertional limitations:

> Exertional limitations affect an individual's ability to meet the seven strength demands of the job:  sitting, standing, walking, lifting, carrying, pushing and pulling. Nonexertional limitations or restrictions affect an individual's ability to meet the other demands of jobs, and include mental limitations, pain limitations, and all physical limitations that are not included in the seven strength demands.

Social Security Regulation ("SSR") 96-4p, 1996 WL 374187, at *2 (SSA July 2, 1996).  More specifically, the ALJ found:

> "[T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but

Order - 6

with the following nonexertional limitations:  The claimant
should deal with things and not people.  The claimant
should not have contact with the public and should have
limited contact with coworkers.  The claimant is limited to
one[-] to two-step, simple tasks.

(Tr. 27.)  This is Mr. Schelin's RFC.  Having determined the RFC, the
ALJ turned to his "past relevant work."  20 C.F.R. § 416.965(a).  He
found Mr. Schelin is unable to perform his past relevant work given
his RFC.  (Tr. 30.)  Thus, the ALJ moved to step five.

E. Step Five

    At step five, the burden shifts to the commissioner to provide
"evidence that demonstrates that other work exists in significant
numbers in the national economy that [Mr. Schelin] can do, given
[his] residual functional capacity and vocational factors."  20
C.F.R. § 416.960(c)(2).  As a general rule, there are two ways the
Commissioner may satisfy her burden:  "(1) by the testimony of a
vocational expert, or (2) by reference to the Medical-Vocational
Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."  *Lounsbury v.
Barnhart*, 468 F.3d 1111, 1114 (9th Cir.2006).  At the hearing during
March of 2013, the ALJ considered the testimony of a vocational
expert whose name is Thomas Polsin.  Mr. Polsin testified Mr. Schelin
could work as an "industrial cleaner" (Tr. 64) or a "housekeeping
cleaner" (Tr. 67).  Mr. Schelin took issue with Mr. Polsin's
testimony.  He argued he has little chance of securing those types of
jobs because of his criminal history.  (Tr. 66-67.)  The ALJ credited
Mr. Polsin's testimony rather than Mr. Schelin's.  Based upon Mr.
Polsin's testimony, the ALJ found that, "considering the claimant's

age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Tr. 32.)  Consequently, the ALJ concluded Mr. Schelin is not disabled.  *Id.*

### CLAIMANT'S ALLEGATIONS

Mr. Schelin disagrees with the ALJ's analysis.  As Mr. Schelin points out, he was unrepresented at the administrative hearing.  He argues the ALJ did not adequately develop the record.  Furthermore, according to Mr. Schelin, the ALJ improperly discounted his credibility, and he failed to give adequate weight to Dr. Arnold's psychological assessments.  In view of those alleged errors, Mr. Schelin asks the Court to reverse the ALJ's unfavorable decision.

### STANDARD OF REVIEW

A district court has "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g). However, review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"  *Id.*  As a result, the Commissioner's decision "will be disturbed only if it is not supported by substantial evidence or it is based on legal error."  *Green v. Heckler*, 803 F.2d 528, 529 (9th Cir.1986).  "Substantial evidence" means more than a mere scintilla, . . . but less than a preponderance."  *Desrosiers v. Sec'y of Health & Human Servs.*, 846

F.2d 573, 576 (9th Cir.1988) (internal punctuation and citations omitted).

**ASSESSING MR. SCHELIN'S CREDIBILITY**

A claimant's statements about his impairments, restrictions, and daily activities are evidence.  20 C.F.R. § 416.912(b)(3).  By themselves, however, they are not enough to establish the existence of disability.  20 C.F.R. § 416.929(a).  SSR 96-7p explains:

> No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.

1996 WL 374186, at *1 (July 2, 1996).  This means a claimant has a two-part burden of production:  "(1) she must produce objective medical evidence of an impairment or impairments; and (2) she must show that the impairment or combination of impairments could reasonably be expected to (not that it did in fact) produce some degree of symptom."  *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir.1996) (explaining *Cotton v. Bowen*, 799 F.2d 1403, 1407-08 (9th Cir.1986)).

Statements Concerning Mental Impairments

At least with respect to mental impairments, Mr. Schelin fulfilled his burden of production.  The ALJ found, "[C]laimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms[.]"  (Tr. 28.)  That being the case, the ALJ had to evaluate "the intensity, persistence, and

Order - 9

functionally limiting effects of the symptoms" in order to determine "the extent to which the symptoms affect the individual's ability to do basic work activities."  SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).  "This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects."  *Id.*  A credibility determination involves a careful examination of the record as a whole.  The ALJ must decide whether the claimant's "statements can be believed and accepted as true."  SSR 96-7p, 1996 WL 374186, at *4.  However, the ALJ's discretion is subject to an important qualification.  If there is no evidence of malingering on the claimant's part, "the ALJ may reject the claimant's testimony regarding the severity of her symptoms only if he makes specific findings stating clear and convincing reasons for doing so."  *Smolen*, 80 F.3d at 1283.  Here, the ALJ did not cite any evidence of malingering.  Thus, the above-described rule applies.

The ALJ acknowledged Mr. Schelin suffers from personality disorders.  While a personality disorder tends to be intractable (Tr. 47), some of the symptoms can be ameliorated through mental health medications and counseling.  Despite the fact treatment may provide some relief, there were periods of time during which Mr. Schelin did not take the medications that had been prescribed for him, nor did he participate in counseling.  The omission is significant.  SSR 96-7p says a claimant's "statements may be less credible if . . . the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."  *Id.*  Consequently, the ALJ properly noted Mr. Schelin's

failure to participate fully in treatment.  *See Fair v. Bowen*, 885
F.2d 597, 603 (9th Cir.1989) (in assessing credibility, an ALJ may
consider the claimant's unexplained, or inadequately explained,
"failure to follow a prescribed course of treatment").

Despite Mr. Schelin's inconsistent participation in treatment,
at least one mental status exam showed his "appearance was
appropriate, he was oriented, his affect was appropriate, his
intellect was average, he was cooperative, his thought processes were
logical, his thought content was unremarkable and the claimant denied
suicide thoughts." (Tr. 28.) (summarizing the results of an exam
that occurred on September 28, 2011).  The ALJ thought the results of
the mental status exam were consistent with other evidence in the
record.  According to the ALJ, the evidence indicated Mr. Schelin was
able "to perform a full range of daily activities." *Id.* Not only
that, but also Mr. Schelin occasionally attended social events, and
he was able to get around town either by taking a bus or by pedaling
his bicycle.

The ALJ's findings with respect to Mr. Schelin's daily
activities are supported by, for example, comments Mr. Schelin made
to Dr. Arnold during an evaluation that occurred on June 21, 2012.
Dr. Arnold recorded Mr. Schelin as saying he was:

> Staying in a trailer with grandmother and on a couch of a
> friend.  Separated from his wife a week ago, homeless.  He
> uses the bus and rides a bike to get to appointments.  He
> is able to take care of personal hygiene.  Wakes between
> 5-11 am. He will try and find work, watch TV, ride his bike
> (good distraction and makes him feel good).  Has problems
> falling and staying asleep.

Order - 11

Mr. Schelin backed away from some of those statements when he testified at the administrative hearing.  While he acknowledged his ability to maintain basic hygiene and to leave his home each day in order to obtain at least one meal (Tr. 43), he said he had lost interest in bicycling and exercising.  *Id.* at 44.  It was the ALJ's responsibility to resolve any contradictions in the record.  *See Treichler v. Comm'r Soc. Sec. Admin.*, No. 12-35944, 2014 WL 7332774, at * 6 (9th Cir. Dec. 24, 2014) (citing 42 U.S.C. § 405(g) and *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.1995)).  Judicial review of the ALJ's decision is "highly deferential."  *See, e.g., Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir.2009).  The ALJ decided Mr. Schelin candidly described his daily routine when he met with Dr. Arnold on June 21, 2012.  A claimant's candid description of his daily routine provides reliable evidence concerning the activities he typically performs on a daily basis.  Thus, Mr. Schelin's comments to Dr. Arnold provide substantial evidence in support of the ALJ's determination he is able to perform a full range of daily activities.

Not all of the skills Mr. Schelin employs during a typical day are transferable to a work setting, but some are.  For example, in virtually every work setting, a person must be able to maintain personal hygiene in order to hold a job.  Mr. Schelin can do that.  Again, by way of example, a person must be able to get to and from the work site in order to keep the job.  The ALJ found Mr. Schelin is able to use public transportation or his bicycle to get around the city in which he lives.  The fact Mr. Schelin is able to perform

tasks such as these tends to undermine his description of the limitations he faces. *Cf. Fair*, 885 F.2d at 603 ("if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit an allegation of disabling excess pain" (emphasis omitted)).

Finally, the ALJ considered Mr. Schelin's employment history and his efforts to find a job since his 2011 release from prison. As the ALJ read the record, the evidence indicates Mr. Schelin has walked off jobs in the past. (Tr. 28.) This interpretation of the record appears to be based upon a statement Mr. Schelin made to a mental health professional at the Community Health Association of Spokane ("CHAS") on September 28, 2011. Mr. Schelin said he "[h]ates being called 'stupid[,]'" . . . and "[h]e has walked off jobs when called this." (Tr. 267.) It is unclear which job(s) Mr. Schelin was referring to. Consequently, it is difficult to determine whether the ALJ's interpretation of the record is supported by the evidence. The ALJ was on much firmer ground when he turned to Mr. Schelin's more recent efforts to find a job. The ALJ noted his impairments did not prevent him "from working/looking for work" during January of 2012. This observation is supported by the record. Mr. Schelin reported looking for work during the period indicated by the ALJ, although he complained looking for work was very stressful. (Tr. 285.)

To summarize, the ALJ provided a number of clear reasons for discounting Mr. Schelin's statements concerning the impact of his

Order - 13

mental impairments.  Mr. Schelin has not fully engaged in treatment even though it would help him cope with the symptoms of depression. The results of at least one mental status exam were encouraging.  He is able to perform a full range of daily activities, and he is able to look for work.  Taken together, the reasons provided by the ALJ are convincing reasons for discounting Mr. Schelin's "statements concerning the intensity, persistence and limiting effects of" symptoms that are associated with his mental impairments.

<u>Statements Concerning Physical Pain</u>

On two occasions, Mr. Schelin complained of back pain to Susan Dennie, who is an Advanced Registered Nurse Practitioner ("ARNP"). One occasion was September 7, 2011; the other was January 25, 2012. On neither occasion was Ms. Dennie able to substantiate Mr. Schelin's complaints with objective findings.  As a result, the ALJ discounted Mr. Schelin's complaints of back pain.  This was improper, says Mr. Schelin.  He submits depression can cause physical symptoms, including "vague aches and pain."  Assuming Mr. Schelin is correct, the fact remains none of the health care providers or mental health professionals who evaluated him suggested, much less found, a connection between his depression and his complaints of pain.  Thus, the ALJ was justified in concluding his complaints were not supported by "objective findings."

**WEIGHT TO BE GIVEN DR. ARNOLD'S ASSESSMENTS**

Dr. John Arnold is a psychologist who evaluated Mr. Schelin on two occasions at the request of a state agency.  The first evaluation occurred during August of 2011; the second during June of 2012.  On

both occasions, Dr. Arnold prepared a written report.  Both reports were fairly pessimistic.  The ALJ assigned "some weight" to each one. Mr. Schelin argues Dr. Arnold's reports are entitled to greater weight than that.

The weight to which a medical or psychological evaluation is entitled depends, in part, on the evaluator's relationship to the claimant.  "Cases in this circuit distinguish among the opinions of three types of physicians:  (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995).  "[T]he term 'physician' or 'doctor' includes psychologists and other health professionals who do not have M.D.'s." *Id.* at n.7.  Of the three classes of physicians, the testimony of a treating physician is entitled to the greatest weight. This rule is "'based not only on the fact that he is employed to cure but also on his greater opportunity to observe and know the patient as an individual.'" *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983) (quoting *Bowman v. Heckler*, 706 F.2d 564, 568 (5th Cir.1983)).  "While the opinion of a treating physician is thus entitled to greater weight than that of an examining physician, the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir.2014) (citing *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir.2008)).  Although Dr. Arnold never treated Mr. Schelin, he examined him on two occasions.  In order to reject

Order - 15

the opinion of an examining psychologist, an ALJ must "give clear and convincing reasons." *Regennitter v. Comm'r. of Soc. Sec. Admin.*, 166 F.3d 1294, 1298 (9th Cir.1999).

<u>2011 Evaluation</u>

Dr. Arnold concluded his 2011 report with an assessment of Mr. Schelin's employability.  The following remarks are representative:

> Anthony admits to having spent the majority of his adult life incarcerated.  Being recently released from prison he is having difficult adjusting to meeting the demands of daily living.  This combined with his lack of impulse control and angry outburst suggests his prognosis would be considered guarded.  He will require intense [mental health] support and intervention.  Given his history and current psychological symptoms it is highly unlikely he would currently succeed in the employment setting.  . . . He experiences helplessness and hopelessness on a daily basis.  He [is] prone to becoming angry with minimal stressors.  Even minimal stress will create anger, anxiety and a need for social isolation.  . . .

(Tr. 308.)  The ALJ did not think Dr. Arnold's pessimism was entirely justified.  While he agreed "[o]bjective testing shows some restrictions," he rejected Dr. Arnold's findings regarding the extent of the restrictions.  The ALJ thought he placed too much weight upon Mr. Schelin's subjective complaints, especially his "history of abuse and extensive incarceration."  In addition, he thought Dr. Arnold had relied upon an irrelevant consideration, *viz.*, that Mr. Schelin was having trouble adjusting to life in a non-institutional setting. That may have been so, the ALJ seemed to concede, but the fact remained Mr. Schelin had worked in the past.  According to the ALJ,

Order - 16

this circumstance suggested he would be able to do so again.  The ALJ also mentioned the GAF score Dr. Arnold had calculated.  It was 52.[2]  The ALJ's response to Dr. Arnold's GAF calculation was mixed.  On the one hand, the ALJ was concerned he had relied upon Mr. Schelin's impecuniousness, which, in the ALJ's opinion, was irrelevant to the calculation of the GAF.  On the other hand, the ALJ noted the GAF score reflected "fairly moderate limitations."  To the ALJ's way of thinking, this suggested Mr. Schelin's limitations are less severe than Dr. Arnold indicated.  The ALJ provided one other reason for discounting the 2011 evaluation.  He was satisfied his determination of Mr. Schelin's RFC addressed any work-related limitations.

As the preceding summary indicates, the ALJ's decision contains several clear and convincing reasons for discounting Dr. Arnold's 2011 evaluation.  One of the reasons was Dr. Arnold's heavy reliance upon Mr. Schelin's subjective complaints.  Dr. Arnold's reliance upon them was problematic because they were not entirely credible.  They tended to overstate the intensity, persistence and limiting effects of Mr. Schelin's symptoms.  *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir.2001) (where a physician's opinion is based primarily upon the claimant's subjective complaints and testing that is within

[2]The acronym "GAF" stands for Global Assessment of Functioning.  "'A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment.'"  *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1160 n.2 (9th Cir.2012) (quoting *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir.1998)).

Order - 17

the claimant's control, and where the ALJ properly discounts the claimant's credibility, the ALJ may discount the physician's opinion).  Another of the ALJ's reasons for discounting the 2011 evaluation was Mr. Schelin's employment history.  Though Mr. Schelin may not have worked very much, the fact remained he had worked.  Then there was the GAF score.  Assuming it was calculated correctly (and the ALJ was concerned Dr. Arnold had relied upon an improper consideration), a score of 52 reflects "fairly moderate limitations."  Thus, it tended to undercut Dr. Arnold's pessimistic assessment.[3]

### 2012 Evaluation

Dr. Arnold also evaluated Mr. Schelin during June of 2012.  Once again, the ALJ did not fully credit Dr. Arnold's conclusions.  He began by noting Dr. Arnold had provided "little analysis about claimant's work skills."  To the extent Dr. Arnold had discussed work skills, said the ALJ, his discussion suggested Mr. Schelin "could perform some type of work activity."  For example, Dr. Arnold acknowledged Mr. Schelin "could perform simple tasks and concentrate up to moderate periods[,]" and he could "ride the bus."  The ALJ also took issue with Dr. Arnold's determination Mr. Schelin's "symptoms would negatively affect [his] job performance[.]"  The ALJ thought

---

[3]"The fifth edition of the DSM, published in 2013, has abandoned the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'"  *Williams v. Calvin*, 757 F.3d 610, 613 (7th Cir.2014) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed.2013)).

Order - 18

Dr. Arnold's pessimistic conclusion was unjustified "given the unremarkable mental status examination/ability to relate appropriately during the assessment."

As with the 2011 evaluation, the ALJ provided clear and convincing reasons for discounting the 2012 evaluation. One of the most important reasons was this: Dr. Arnold conceded Mr. Schelin could work to some extent. He said as much in his report when explaining Mr. Schelin's "[r]esidual capacity"; that is to say, what he is "capable of doing despite his . . . mental health impairments":

> Anthony will be able to remember locations and simple work like tasks. He will be able to understand, remember and carryout [sic] simple verbal and written instructions. He will be able to concentrate and attend for short to moderate periods. He will be able to ask simple questions. He will be able to adhere to basic standards of neatness and cleanliness. He will be able to use the bus occasionally. He will be aware of normal hazards and take appropriate precautions. He will be able to make plans on his own.

(Tr. 369.) Despite the preceding assessment, Dr. Arnold remained pessimistic. The ALJ explained Dr. Arnold's pessimism was inconsistent with the results of the mental status exam he performed. As the ALJ noted, the 2012 mental status exam revealed, "[T]he claimant's appearance was unremarkable, he made full eye contact, his thought content was appropriate, he performed serial sevens and threes with one error, he spelled 'world' forwards/backwards, his insight was poor and his judgment was limited." (Tr. 29.) It was not unreasonable for the ALJ to note inconsistencies such as this.

The existence of such inconsistencies supported the ALJ's decision to discount Dr. Arnold's opinions to some extent.

**ADEQUACY OF RECORD**

Mr. Schelin represented himself at the administrative hearing. He argues the ALJ failed to adequately develop the record. *See Tonapetyan*, 242 F.3d at 1150 ("The ALJ in a social security case has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered." (internal punctuation and citations omitted)). According to Mr. Schelin, the ALJ should have requested records from a number of sources. Of particular importance, says Mr. Schelin, are the records of his treatment while he was incarcerated. The ALJ knew he had been incarcerated in the prison's mental health unit. In Mr. Schelin's opinion, that knowledge should have prompted the ALJ to seek the prison's treatment records. Mr. Schelin is mistaken. "An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir.2001). Mr. Schelin was evaluated numerous times between the summer of 2011 and 2012, including twice by Dr. Arnold. By examining those evaluations (especially any changes that occurred during the course of the year), the ALJ could form a reasonably accurate assessment of Mr. Schelin's mental impairments.

**NON-EXAMINING SOURCES**

The ALJ gave "great weight" to the testimony of non-examining psychologist Joseph Cools, Ph.D. (Tr. 30.) He gave "significant

weight" to the opinions of three other non-examining experts. *Id.*
Mr. Schelin argues the ALJ erred by giving greater weight to the
opinions of non-examining experts than to the opinions of Dr. Arnold,
an examining psychologist. As Mr. Schelin observes, "Without a
personal medical evaluation it is almost impossible to assess the
residual functional capacity of any individual." *Penny v. Sullivan*,
2 F.3d 953, 958 (9th Cir.1993).

All things being equal, the opinion of an examining psychologist
is entitled to greater weight than the opinion of a non-examining
psychologist. However, *Penny* is distinguishable. To begin with, the
non-examining expert upon whom the ALJ relied heavily in *Penny* did
not consider the claimant's description of his pain. *Id.* at 957. In
addition, the ALJ improperly discounted the claimant's description of
the pain he was experiencing because the claimant did not present
medical evidence supporting his description of the severity of the
pain. *Id.* at 957. Finally, the ALJ's decision to discount the
claimant's description of his pain was contradicted both by the
medical records and by the testimony of an examining physician. *Id.*
at 957-58.

None of the circumstances that undermined the ALJ's decision in
*Penny* are present in this case. Here, unlike *Penny*, the ALJ did not
rely upon the testimony of a non-examining expert as a basis for
discounting either Mr. Schelin's testimony or Dr. Arnold's opinions.
Nor was Dr. Cools ignorant of Mr. Schelin's statements. To the
contrary, he treated them very seriously. This can be seen by
comparing Dr. Cools' and Dr. Arnold's respective assessments of the

Order - 21

extent to which Mr. Schelin's impairments limit his capacity to work. While Dr. Arnold was somewhat more pessimistic than Dr. Cools, their respective assessments are remarkably similar.

**CONCLUSION**

The record before the ALJ was well enough developed to permit him to evaluate the credibility of Mr. Schelin and Dr. Arnold.  The ALJ did not err in his treatment of Mr. Schelin's testimony or Dr. Arnold's opinions.  As required by the law of this circuit, he gave clear and convincing reasons for partially discounting their evidence.  Nor did the ALJ err in his treatment of the opinions of the non-examining experts.  One of the most important was Dr. Cools, who was not unsympathetic to Mr. Schelin.  To the contrary, Dr. Cools treated Mr. Schelin's statements very seriously.  Indeed, in the end, Dr. Cools' assessment of Mr. Schelin's limitations was similar to Dr. Arnold's; not identical to be sure, but similar.  Of particular significance is the fact neither expert thinks Mr. Schelin is completely unable to work.  To the contrary, both experts think Mr. Schelin can perform a job that involves simple tasks and that does not require interaction with either coworkers or the public.  In that respect, Dr. Arnold's assessment is not entirely inconsistent with the ALJ's formulation of Mr. Schelin's residual functional capacity, *viz.*:

> The claimant should deal with things and not people.  The claimant should not have contact with the public and should have limited contact with coworkers.  The claimant is limited to one[-] to two-step, simple tasks.

(Tr. 27.)  This formulation is supported by substantial evidence.

Order - 22

Thus, the ALJ did not err at step four in the sequential evaluation process.  The final issue, then, is whether jobs of the type Mr. Schelin is capable of performing exist in significant numbers in the national economy.  A vocational expert responded in the affirmative, and the ALJ credited his testimony.  The ALJ did not err in doing so.  Since there are jobs Mr. Schelin can perform, and since they exist in significant numbers in the national economy, the ALJ had a substantial basis for concluding Mr. Schelin is not disabled within the meaning of 42 U.S.C. § 1382c(a)(3)(A).

**IT IS HEREBY ORDERED:**

1. The "Plaintiff's Motion for Summary Judgment" (**ECF No. 14**) is **denied.**

2. The "Defendant's Motion for Summary Judgment" (**ECF No. 15**) is **granted.**

**IT IS SO ORDERED.**  The District Court Executive is hereby directed to file this order, enter judgment accordingly, furnish copies of this order and the judgment to counsel, and close this case.

**DATED** this 11th day of February, 2015.

s/Fred Van Sickle

Fred Van Sickle
United States District Judge
